Good afternoon, Your Honors. May it please the Court and Counsel, my name is Tim Gabrielson. I'm from the Federal Public Defender's Office in Tucson. Along with me today is Steve Eberhardt, a CJA panel lawyer who has represented Mr. Gulbrandson for a long number of years. This case, as the Court is aware, presents the question of whether Mr. Gulbrandson is entitled to an evidentiary hearing because he was denied one in state court. I'd like to focus in the time we have today on claims 1 and 2 in our brief. There may be some spillover into some of the other issues in the second or successive application, but the Court has given us some direction in the past week that the Court would like to hear argument on the applicability of Cullen v. Pinholster to Mr. Gulbrandson's case, and so I think that's a propitious place for me to begin the argument this morning. In short, I don't think that the Pinholster decision has any application to David Gulbrandson's case, and it's for these reasons. In David Gulbrandson's case, his post-conviction lawyer at the state level complied with all the requirements of state law in bringing his claim of ineffective assistance of capital sentencing counsel. He attached four affidavits to the relief. The state court judge misinterpreted the facts in part because the state, the attorney general who was representing the state at that time, I think made a misstatement as to the nature of the facts contained in the affidavit of Dr. Martin Blinder, and the state court, rather than critically reading Dr. Blinder's affidavit, simply lifted the language from the state's response to the court's order. Mr. Gulbrandson's attorney did everything he should have done to acquire the evidentiary hearing, to develop his mitigating facts, and to attack the statutory, the lone statutory aggravating factor that was at play in this case, and that was that the murder was accompanied by gratuitous violence. Counsel, may I ask you, in your view, was this case considered on the merits in state court? Your Honor, I think that the post-conviction court's judgment is sort of a hybrid. I think the problem with the state court's judgment is that the court, the court did not discuss the facts that were contained in the post-conviction affidavit. He didn't engage with the evidence, as Sears v. Upton, the Supreme Court case, tells us that the state court judge has to do in order to get around the problem in Michael Williams v. Taylor, with respect to whether the defendant's entitled to that evidentiary hearing. Well, in your view, does the fact that the state didn't discuss all of the facts as you think it should have make it a case that was not decided on the merits? I don't think the case was decided on the merits, and I think the major reason, Judge Rowlinson, is because the U.S. Supreme Court, in a number of cases, now going back to Rompilla, but also in Sears v. Upton, and actually in the pinholster decision itself, says that the state court has to engage appropriate process to make sure that Federal constitutional claims are vindicated in the state courts. The AEDPA is conferring on those state courts the first opportunity to correct a constitutional violation, but there's responsibilities and duties that attach to the state court. The U.S. Supreme Court is very clear about that. Excuse me, counsel. No, you go ahead. Are you saying that there was an unreasonable determination of the facts by the state court because it did not consider all of these things? It had before it Dr. Binder's 1992 pretrial report, which did not mention the issue of McDaughton. It had the trial counsel's statements to the trial court before trial that Dr. Binder would testify a petitioner was McDaughton insane. They had Dr. Binder's trial testimony, which the counsel did not ask about McDaughton. Then we had the trial counsel's 1997 declaration, which the state court alluded to, but it does precisely pinpoint that Dr. Binder stated repeatedly before trial that he was unwilling to opine that petitioner was McDaughton insane. And then we had the declaration itself stating he was willing at the time of trial and in 1997 to testify that petitioner's mental illness significantly affected his ability to appreciate the nature and quality of his acts. As I hear your argument, and I read your briefs, you were saying that the state court did not consider all of these facts and, therefore, made an unreasonable determination of the facts and, therefore, EDMA deference did not apply. Am I correct? Judge, I think you're spot on with that. And the only addition I would make to that is, while it appears that it's a 2254D2 problem because the court misstated what the facts were in Dr. Binder's affidavit, the U.S. Supreme Court said in Rompilla, Rompilla v. Baird in 2005, that where the state court fails to discuss the new facts that are presented in the state post-conviction petition, it's also an unreasonable application of United States Supreme Court precedent. And so there's really two prongs to it, Judge Nelson. It's 2254D1 and 2. But you're right. I mean, at first blush, it certainly looks like the state court judge's failure to acknowledge that Dr. Binder had at least three significant opinions for sentencing that he was not asked about by trial counsel at the — he wasn't recalled at the capital sentencing hearing to present evidence that David Gobranson could be rehabilitated, that certainly had no place in the guilt phase. He was not asked about that. Could I just — I'm having a little trouble getting your argument now into the framework of your brief. So in your briefs, you were making a Strickland claim that there was ineffective assistance of counsel and that the state court was unreasonable in its application of Strickland. So can you explain to me how — what is the unreasonable determination of the facts that makes its Strickland determination unreasonable? Judge, let me be exactly clear. And I apologize for any lack of clarity in the briefs. The argument, as we briefed it, is that there — were this Court to find that there was sufficient evidence taking Dr. Binder's post-conviction affidavit, which — the contents of which haven't — the veracity of Dr. Binder has not been challenged except for the strange statement that the state argued in the post-conviction proceeding that somehow Dr. Binder fabricated his — the part of his affidavit where he said he held those opinions back at the time of trial and could have testified to those. The state says there isn't any evidence that that's true. Well, Dr. Binder is a medical doctor who signed an affidavit saying that he held those opinions at the time of trial and he could have testified to those opinions. There's nothing else to refute that. There's no other evidence that — and even — But his — I guess I didn't see a big distinction between the 97 affidavit and the 92 report and his 92 testimony. But even — he doesn't actually make the monotonous statement. He says significantly impaired. But putting that aside, I'm hoping that you'll explain to me how that fits into your Strickland argument or does it not fit into — is it a different argument? Judge, the entirety of those first two arguments is within the context of Strickland. However, because Mr. Gulbranson's attorney in post-conviction was deprived the opportunity to fully explain, to have Dr. Binder testify to the fullness of his opinions with respect to sentencing, there's a Michael Williams problem here. And as I said, if the Court says — if the Court finds that there's not enough — there's not enough evidence in this record to grant relief on the — on the record as it stood when it was dismissed out of the State post-conviction court, Mr. Gulbranson is respectfully requesting that the Court do what the U.S. Supreme Court did in Michael Williams, and that is send the case back for the evidentiary hearing. Can you help me understand, what was the State court's error in its ineffective assistance of counsel ruling that — that you're now raising to our attention or you're now arguing? I'd be happy to, Judge Akuta. I'm happy to address that. The State court judge, and I'm reading from Excerpt 4044, the State post-conviction court's dismissal, the — the State court judge in the Rule 32 in the State post-conviction petition said, Additionally, it should be observed that at the time of trial, defense counsel was under the impression Dr. Binder was unwilling to render opinions other than those he testified to at trial and which were contained in his written report. Although Dr. Binder's opinions may now differ from those he rendered at trial, his counsel's failure to elicit these opinions of which he was unaware of at the aggravation mitigation hearing does not constitute ineffective assistance of counsel. But we have to say that's objectively unreasonable. Absolutely. And so why is that objectively unreasonable for the State court to have made that determination? Because — and I have to quarrel with your premise that what Dr. Binder said in 1997 was — was coextensive with what he testified to or what he reported in 1992. There's three significant facts in his 1997 affidavit that were not in front of the jury at the guilt phase, were not in front of the judge who presided over that jury and who later determined sentence. And those three things are found in the — in Dr. Binder's report at paragraphs 6E, and that is that at the time of the — and I'm sorry, that's at excerpt 685. At the time of the — of the crime, Gil Branson was suffering mental illness described above that would significantly affect his ability to appreciate the nature and quality of his acts or understand right from wrong. That's a cognitive incapacity. The statutory aggravating factor of gratuitous violence requires — and I supplemented a case last week to the court, the Wallace decision from the Arizona Supreme Court. Counsel, what paragraph are you reading from? I'm sorry? What paragraph are you reading from? I'm sorry, Judge Rawlinson. Paragraph E, that's 6E on excerpt 685. Right. But paragraph 6A sets for the mental disabilities that — that that opinion was predicated on. And so it was pretty much the same thing that he said in 92, right? No. But paragraph E is the addendum to that that says I have — he says earlier in the declaration, I have opinions that are distinct from what I testified to in 1992. And so he reiterates that these are the things I found. And then here are the additional mental states that are relevant. Post-conviction counsel went to Dr. Binder and said, can you comment, please, on the mental states that are relevant both to the statutory aggravating factor and to what we call the G1 mitigating factor? And also, Dr. Binder additionally found in paragraph 8 of his affidavit at ER 685 that it's very probable that Gobranson can be rehabilitated, learn to control and conform his behavior, manage the psychological deficits created by his illnesses and be rehabilitated while in institutional custody. Did you exhaust the argument? This is, I think, the government raises this question, the argument that there was ineffective assistance of counsel because the trial counsel didn't raise a rehabilitation or didn't get Dr. Binder to testify as to rehabilitation at the sentencing phase because it wasn't raised in those terms in the State court. I didn't see it address it. Judge, what happened was the post-conviction attorney raised the claim of ineffective assistance of counsel. There were two separate ineffective assistance claims going to Dr. Binder's testimony. One went to the G1 factor. One went to the F6 statutory aggravator of gratuitousness. The post-conviction attorney, Richard Strom, indicated with respect to those claims that he was incorporating the opinions as stated by Dr. Binder in his 1997 affidavit. He said these are the mental states that were mitigating or attacked the statutory aggravator, and I'm incorporating by reference, I'm relying on the entirety of Dr. Binder's 1997 affidavit. And I want to be very clear here that Mr. Strom was not asking the Court to peruse a really lengthy affidavit, which I think would be unreasonable. The salient facts concerning mitigation and the attack on the aggravator were stated in the three short paragraphs at the end of the affidavit. The rehabilitation is a separate mitigation factor. Yes. It's a non-statutory mitigation factor, Judge Acuda. But in your view, the general reference was sufficient to raise that to the State court? Is that your view? Absolutely, because Mr. Strom referred to it. And that is certainly one of them. That's paragraph 8 in its entirety. That's a rehabilitation paragraph. And so would it have been nice if Mr. Strom said something more? Maybe, but I don't think it was legally required. As I said, I think his – I think Dr. Binder's affidavit is so succinct and he was so clear in what he was saying, it's not like courts actually have to really dig to try to find the meaning. I think Mr. Strom was – in some ways, I'd like to say that what Mr. Strom did is sort of the prototype of what a State post-conviction attorney ought to do. This Court has seen – not this panel necessarily, but Your Honors asked us to look at the Stokely case. In Stokely's case, ultimately, the Ninth Circuit found that there was no colorable claim, in part because the defendant's lawyer at State post-conviction didn't attach anything to the State post-conviction petition. Ultimately, it resulted in the finding of no colorable claim. Mr. Gobranson's lawyer did everything he was required to do under State law. Last year, the Court denied relief to – in a case called West v. Ryan. That was another case where the attorney simply, for lack of a better term, winged some allegations in the text of the post-conviction petition without actually going out and getting an affidavit from the doctor or the psychologist who would have supported it. Ultimately, this Court denied Federal habeas corpus relief to Mr. West, and he was executed because his post-conviction lawyer screwed up, and therefore, the claims were not exhausted when they came to Federal court and came before this Court. Mr. Strom, I think, did everything he should have done. And I want to be really clear, Judge Akuta, because I don't want this to be misunderstood. The claims that – the facts that Dr. Blinder would testify to were that not only the prospect for rehabilitation, which the U.S. Supreme Court in Lockett v. Ohio 30 years ago vacated a death sentence because the Ohio State statute did not permit consideration of rehabilitative potential. And yet, in case after case, and this Court knows this, prosecutors stand up and tell judges in the old days in Arizona before rank, please impose the death penalty because this guy is going to be a danger in the future. That's what's so critical about the absence of this rehabilitation evidence in Mr. Goldbranson's case. The attorney, the trial counsel, did raise some rehabilitation evidence at sentencing. Isn't that right? He had testimony from the prison and from an officer who mentioned his good behavior and his demeanor. Isn't that right at the sentencing? It was in a very controlled setting. Mr. Goldbranson – the evidence was Mr. Goldbranson got one disciplinary ticket in the year and a half or two years he was in pretrial custody. And an officer whose only function was to transport David Goldbranson to court, over the course of 700 days, he said he was with David Goldbranson about six to eight times, and David Goldbranson did not act out. That's the sum total. That hardly constitutes rehabilitation. We're talking, Judge Akuta, about how this guy is going to behave for the next 20 or 30 or 40 years if he – if the judge were to give him a sentence of life in prison. So the testimony that did come in, I think it was fly by the seat of your pants lawyering. It was not really an effort to try to allow the sentencing judge to know exactly what David Goldbranson's rehabilitative potential would have been. Judge, does the record reflect that the sentencing judge in this case was the same judge who adjudicated the post-conviction petition? Yes, Your Honor. And so doesn't that militate against the finding of prejudice if the same judge who imposed the sentence heard all of the new evidence and didn't give relief? Judge, I would agree with you.  that was presented to him in the case. If he actually heard, considered, and as the Supreme Court requires, engaged with the evidence. He didn't engage with the evidence. He denied the existence of the evidence that was contained in Dr. Blender's affidavit. So in a typical case we – But it was presented to him, right? The affidavit, all of that was before him. Yes. You quarrel with how much weight he gave to it, but that's not the issue. Judges said he didn't give it any weight. He found that there was nothing different. And again, he lifted the language from the State's response to the post-conviction petition where the State said the fullness of Dr. Blender's opinions were already before the Court. That's absolutely, that's unequivocally not true. There were three significant facts. Would you repeat those three significant facts? You gave us one. Yes, I'd be happy to, Your Honor. The first two come out of argument one in the opening brief. But the non-statutory mitigation there is the prospect for rehabilitation. And that, like I said, is a huge one because of the U.S. Supreme Court referencing that in that 1978 case, Lockett v. Ohio, as the reason why the death penalty was overturned for Ms. Lockett in that case. The second one is what we call, again, the G-1 statutory mitigating factor, and that is that the defendant's mental illnesses or defects caused him to be unable to appreciate the nature and quality of his executive conduct. But I didn't see in the 97 affidavit that Dr. Blender stated the McNaughton ruling. He said significantly impaired, which wasn't that much different than the state  It's a significant difference. I think we tried to point this out in the reply brief. But that's not – do you agree that that's not what the McNaughton test states? It says he doesn't know. He was suffering from such a mental disease or defect as not to know the nature and quality of the act or did not know that what he was doing was wrong. And he didn't – Dr. Blender did not state that in the 97 affidavit, did he? He doesn't wrap that up, Your Honor, in a nice McNaughton package, because in Arizona at the time, McNaughton didn't have to conform the conduct, didn't have the volitional capacity requirement. It had both the moral and the cognitive capacity requirements. And those are stated in – these are across paragraph 6E on ER 685, where he says, at the time of this rage, he was suffering from the mental illnesses described above that would significantly affect his ability to appreciate the nature and quality of his acts or understand right from – that's the – that would be the McNaughton – I'm sorry for interrupting you, Your Honor. That's the G1 test, which says it doesn't arise to McNaughton. It's significantly a fact, but it still can be a mitigation factor. So I didn't see the plain language of McNaughton there. Well, it – but the death penalty statute in Arizona is not McNaughton. It's not McNaughton. The language is distinct from McNaughton. It sounds a little bit like it, but it's not the same. And what's critical, I think, here, too, is – I'm sorry. I'm missing that, because I was reading from Arizona Revised Statute 13502, which I – my understanding was that was what was applicable at the time. Right. And that's what's – Is that wrong? That's what's stated in paragraph 6E. And I just want to be clear about this. He couldn't – it would have significantly affected his ability to appreciate the nature and quality of his acts or understand right from wrong. Is the word significantly affecting that statute? I don't see them here. No, it doesn't. And that's why – that's in part why I'm saying that this was an opinion that went to sentencing, where in the Arizona insanity statute, the defendant would have to prove by clear and convincing evidence he was insane. The fact that Dr. Blinder was willing to find that, as he said, would significantly affect his ability to appreciate the quality and nature of his acts and understand right from wrong, that is what meets the G-1 statutory mitigating factor. But it might not have been enough. And in Claim 3 – and I thought maybe you were going to Claim 3 to talk about the McNaughton and whether Dr. Blinder's opinion would have justified putting him on and asking him at the guilt phase whether David Gilbranson was McNaughton insane or not. Even assuming that David wasn't, even if Dr. Blinder wasn't going to go there, the fact that Dr. Blinder would have found that it was – even if he couldn't conclude by a psychiatric certainty, which is what the defense would have needed for McNaughton insanity, significantly affected his sufficient, because on the statutory mitigating factor, the defense only has to prove by a preponderance of the evidence, and then the judge has to consider the factor. In this case, the judge found that there was insufficient evidence of the G-1 factor for him to give any weight at all to the G-1 factor. Dr. Blinder's affidavit, our argument is Dr. Blinder's postconviction affidavit states enough for – if trial counsel, Mr. Spillman, had actually asked Dr. Blinder whether he had these opinions about sentencing, this is what Dr. Blinder would have said, and that would have been highly mitigating, and Judge Grounds would necessarily have to have found the presence of the G-1 factor. Now, he could have given it more weight or less weight. That would have been up to him to do. But he couldn't categorically reject it, which is what he did. And I think one other thing that's really important – But why couldn't he have? Because he had the two other doctors, the State's doctors, who said, no, the defendant knows what he's doing, and – Judge, those other doctors said he was not McNaughton insane by the clear and convincing evidence rule. Those doctors did not opine on whether there was a significant possibility that David Goldbranson suffered from those same infirmities. Those are – those are two different standards. They testified to a medical certainty or something like that. They testified that he was not McNaughton insane, and the State brought those opinions forward again and again. There was no reason to doubt his awareness of what he was doing and the wrongfulness of what he was doing was unimpaired. That was Dr. Alexander Don. And I think Scioli, Dr. Scioli – Dr. Scioli also – Scioli said the same thing, testified to a reasonable degree of medical certainty that Goldbranson knew the nature and quality of his acts and the difference between right and wrong when he killed the victim. At the – the opinions came in at the guilt phase, and they were – and they had come to the conclusion – and one of those I think was actually retained by the defense, and Dr. Scioli I think was, and he said – he said, I can't conclude that he was McNaughton insane. But again, that's – whether you're McNaughton insane, that's – that has to be divorced from the mental state for the G1 mitigating factor because the standard is different. You can – you can be less certain as a doctor, as Dr. Blinder was, you can be less certain about your – the strength of your diagnosis of those, for lack of a better term, McNaughton factors. They don't have to be by a psychiatric certainty. They don't have to be by clear and convincing evidence. But the judge would still consider those. But – but even Judge Acuda, if we – even if we put that aside, even if we say that it was close enough, the – the problem with what happened here is the – this Court in Summerlin v. Schreiro said under Arizona law, the – the portion of – of the statutory mitigator that has to do with appreciating the nature and quality of the acts means the defendant has to appreciate the consequences of his actions. The testimony at the guilt phase was that David Gilbranson was in an emotional derangement and lost control, but none of the evidence that the experts testified to at that stage spoke to whether he understood the consequences of those acts. So the – the Arizona Supreme Court and later this Court in the Summerlin case extend this additional gloss to it. If you want to consider it to be – for the State to – to be able to disprove the G-1 factor, they have to prove that the defendant understood the consequences. And that's part of the problem with – with what happens here. If we're trying to transfer the McNaughton rule cleanly into the G-1 mitigating factor, they – they don't fit. They're – it's a round peg in a square hole is what it is. And so there's a difference in the standard of proof, and there's an additional gloss that this Court has recognized in a prior decision that says this isn't the same as McNaughton. There's an additional requirement of understanding consequences when you're talking about the G-1 factor. But again, even if we could put the G-1 factor aside, in that same – in argument one that we make, again, the rehabilitation aspect is – that's Lockett v. Ohio, and that's so compelling that the failure of defense counsel to have elicited that opinion is also an effect of assistance on its own. It's highly compelling non-statutory mitigation. And I wanted to – to just make one point. I know my time is – I only have a couple minutes left, and I want to save a little bit. But in Mr. Spillman's post-conviction affidavit that he did for the State, he said that he – he contracted with Dr. Martin Blinder regarding Mr. Gilbranson's ability to premeditate the murder of Irene Caturan and regarding whether he was McNaughton-insane. He doesn't say that I asked the good doctor for his opinions about these other factors that go – that would come in only at sentencing but would be irrelevant and would draw an objection, as they did. The prosecution did object when Blinder started talking about what David's mental state was at the time of the crime. And at one point, I think the judge even said that might be relevant at the guilt – at the sentencing phase, but that can't come in here because Blinder's not testifying to insanity. So there's an acknowledgment by Mr. Spillman that he didn't ask Dr. Blinder to – let me – let me take this back one step, Judge Yakuta, because I think this is really important. A reasonably competent criminal defense attorney trying a capital case where he suspects his client has mental illness, he goes to the mental health expert, and he says, these are the relevant mental states for the guilt phase. They have to prove premeditation. Maybe there's even a competency issue that they have to deal with. But there's insanity as well in a case like this. Please evaluate my client for that. At the penalty phase, whether it's Dr. Blinder or whether defense counsel would have gone off and gotten a different mental health expert, a reasonably competent criminal defense attorney says, now, here are the other mental states that only come in at the sentencing phase if he's convicted. Rehabilitation, everything in the G1 factor, that's – you know, that can come in. But also, the – he has to be able to attack the statutory aggravating factor. Six months before trial, the State put the defense on notice that it was going to seek to make him eligible for the death penalty on one statutory aggravator, and that was the heinous and depraved factor. Heinousness and depravity under Arizona law goes to the mental state of the defendant. Cruelty, which is part of that factor, goes to what the victim suffered. The trial judge found no cruelty and found no mutilation, which is part of the same F6 statutory aggravator. And the State supreme court invalidated the relishing the murder. So the only thing left standing is whether David engaged in gratuitous violence at the time he killed Ms. Cattaran. Defense counsel had an obligate – You've used your time. I'm sorry, Your Honor. Thank you. We'll hear from the State. May it please the Court, counsel. My name is Suzanne Blomo. I'm with the Arizona Attorney General's Office, and I represent Appalese in this matter. With the exception of two subclaims that were presented by Mr. Gilbranson for the first time in his Ninth Circuit opening brief, all of Gilbranson's claims were adjudicated on the merits in State court. The district court was therefore not required to hold an evidentiary hearing, and in fact, for the district court to have considered any new evidence would have been improper. Counsel, let me just hit her up right there. How could the State court judge have ruled on the merits when we had conflicting evidence and no evidentiary hearing? I don't think that the evidence is as conflicting as Gilbranson would have you believe. First, as to Mr. Gabrielson's argument that the State court somehow relied on evidence, I think it's important to note that Mr. Gabrielson pointed out that the State court used language that defense counsel was under the impression that. Defense counsel was under the impression that. There he may disagree with what defense counsel believed, the correctness or the incorrectness of it, but what defense counsel's understanding of what his expert will and will not testify to is what is relevant to the Strickland claim that was made in State court. Are you claiming that the affidavits of Dr. Blinder of 92 and 97 are identical? There is no 1992 affidavit, but what I am suggesting is that the report in 1992 and the testimony encompassed what he put in his 1997 affidavit. Dr. Blinder does not say in his 1997 affidavit that in this affidavit I have opinions that are distinct and different than the opinions I was asked to render at trial. And it's important to remember that Dr. Blinder was an extremely, extremely qualified and experienced testifying expert. I don't think there's any question about his qualifications. The question is whether or not he testified in 92 whether the defendant knew the consequences of his acts. In 1992, he did not give a McNaughton opinion. And in 1997, he did not give a McNaughton opinion. I'm not talking about McNaughton. I'm talking about the Arizona law. The G-1 mitigator? Yes. I think the problem with his 1997 affidavit is that it combines language from the G-1 mitigator with language from the McNaughton standard. And so while the affidavit does not propose a McNaughton opinion, it does to a certain extent propose that he would have given a G-1 opinion. As to the G-1 opinion, when he testified at trial, he did not give any, you know, magic words and he wasn't asked a question with magic words related to the G-1 opinion. However, he did say that under stress, the defendant would dissociate possibly even to the point of a fugue state. He would tune out consciousness and operate like a robot, a violent, out-of-control robot, and that he would act reflexively without any thought process. That is enough evidence for the trial court, for the sentencer, to find the G-1 mitigator. The problem with that is that the facts and circumstances of the crime and the opinions of Dr. Dahn and Dr. Shalley did not support a finding of the G-1 mitigator. So when you have one expert who's giving testimony, that is enough to establish a G-1 mitigator, and two experts are giving testimony that are saying the G-1 mitigator isn't here, it's perfectly reasonable for the sentencer to say I'm not going to find a G-1 mitigator, but to do what the sentencing judge did here, which is to say I find that his opposing counsel say that in the testimony in 1992, he did not give enough to qualify as a G-1 mitigating factor, and that would only come into play at the time of the actual sentencing. Is that incorrect? I believe that is incorrect. The sentencer was the trial judge. He heard all the testimony that was presented, and in addition, Lyle Smilman presented Dr. Blinder's report to the sentencing judge at the time of sentencing. Combined with his very extensive testimony and with the report that was provided by Mr. Smilman, there was enough information in there. Had the trial judge wanted to find the G-1 mitigator, he could have supported it, but it was contradicted by the opinions of two other experts and by the facts and circumstances of the crime, the fact that this clearly was a premeditated crime. As the Arizona Supreme Court found, there was overwhelming evidence of premeditation. I understand premeditation and G-1 are not exactly the same thing, but certainly those are facts that the sentencer can take into account. The fact that this defendant threatened to kill the victim several weeks before he actually did kill her, and subsequent to that assault, he assaulted her at the same time. He was then incarcerated for two weeks after. And within 10 days of getting out of jail, he commits that murder. That's evidence of premeditation and that he understood what he was doing and that his ability to understand what he was doing was not significantly affected. Dr. Don testified he didn't believe he even had any mental disease or defect. He didn't believe he had bipolar disorder. Dr. Shalley testified he also didn't believe he had bipolar disorder. He believed he had some lesser mood disorder, but not something that was bipolar disorder. Counsel, what's your response to opposing counsel's argument that the post-conviction court failed to engage the facts that were presented and, therefore, did not decide the case on the merits? The post-conviction court is not required to hold an evidentiary hearing to engage the facts. And in this case, the post-conviction court issued what I believe was a 13-page minute entry addressing every claim that was made and addressing the affidavits that had been supplied and finding that there was no colorable claim. And, again, this is the same judge who heard the testimony and rendered sentence. So this was not a, you know, sort of postcard minute entry saying, you know, I just deny it and not addressing the issues. This judge did address the issues. So certainly the 1997 affidavit. You know, at this point, I apologize. I could not point to where in his. I couldn't find it. But, you know, but they. It would be there by implication, but it certainly was not specifically referred to as I read the affidavit. Right. You know, it was before him. And, you know, as I've said, you know, it doesn't that that affidavit does not provide a McNaughton opinion. And the opinions that are. There's no need of a McNaughton opinion in Arizona. I mean, they're not exactly the same thing. No, they're not exactly the same thing. But, I mean, as to the guilt phase, certainly you would have to have a McNaughton opinion. It also goes to the history of this case that I know that the PCR judge did point out in his minute entry, which was in Arizona, evidence, expert testimony that is introduced to negate the mens rea is not admissible. But what about as to the penalty phase? Yes. And that's the G1. So that's what we're talking about, McNaughton and premeditation. As to the G1, you know, I think it's. And this is why I believe that when the prosecutor was questioning Dr. Don in penalty, he didn't ask him specifically to give an opinion on conformed conduct, those magic words, to his requirement, to the requirements of the law, because the trial court had at least held during the guilt phase that that kind of ultimate issue sort of testimony was not going to be allowed. So it's getting the opinion from the expert that would support the finding, not having your expert give the exact finding that was important. And I'm sorry. Help me get back to the actual constitutional issue before us, which, as I understand it, is ineffective assistance of counsel. So the question or the claim that trial counsel was ineffective for failing to have Dr. Blinder testify as to what he would say in 1997 at the sentencing phase, is that correct? And so what we're looking at is whether the State PCR court was unreasonable in saying that the trial counsel did not, was not deficient or that it wasn't prejudicial. Is that right? I think that would be right. And the complaint that Mr. Gabrielson is making is really only goes to the deficient performance prong of Strickland. It doesn't go to the prejudice prong of Strickland. And so even if this Court were to believe that the court, the PCR court, didn't engage on the facts or understood the facts incorrectly, it doesn't go to the prejudice prong. The PCR court found that there was not sufficient evidence to find the G1 mitigating factor because of the opinions of Dr. Don and Dr. Shalley in the facts and circumstances of the crime. Excuse me, counsel. Let me tell you what worries me about this case. There was only one aggravating factor, and that was gratuitous violence. We have the coroner's testimony that although there were many knife wounds, that the victim was not dead until the last wound. In other words, gratuitous violence in Arizona, if you keep inflicting wounds after the victim is dead, that can amount to gratuitous violence. So here we have a coroner's report that the last knife wound was the fatal one, basically. Why wasn't counsel's failure to call Dr. Blunder to testify that Petitioner was impaired in his ability to appreciate the nature and quality of his acts, why wasn't that constitutionally deficient? Well, first off, what I would like to point out to the Court is some things that I didn't point out in my brief, and that's that Dr. Blunder did provide during the guilt phase, and the trial court could consider that evidence in determining whether the gratuitous violence, and actually its heinousness and depravity, that's the aggravating factor, not just gratuitous violence. Gratuitous violence is just a prong of that. And in this case, the sentencing judge found three prongs. Relishing was later thrown out by the Arizona Supreme Court, but the Court found helplessness and gratuitous violence both. But Dr. ---- Was helplessness thrown out as well? Helplessness was not thrown out as well, but helplessness cannot on its own support the F6 finding under Arizona law, but in conjunction with gratuitous violence, it can. So the testimony that Dr. Blunder provided about gratuitous violence, and he did specifically use the words gratuitous violence, and it's at ER 360 to 361, he opined that under the circumstances that defense counsel had given to him, coupled with profound, unremitting narcissistic injury, you will set the stage for gratuitous violence. And defense counsel asked him, and such action might result reflexively rather than with any thought process. And Dr. Blunder responded, yes. Further, at excerpts of record 352 to 355, Dr. Blunder testified that gratuitous violence in domestic violence cases is usual, and in such cases, gratuitous violence normally occurs where the defendant is out of control. He went on to testify that binding is not indicative of premeditation. So that testimony was sufficient to, again, address this question of whether or not the defendant engaged, excuse me, in gratuitous violence. The other issue that I wanted to raise is that this also, you know, goes to the question of what the trial court would have allowed in terms of testimony based on the state of the Arizona law, that because Dr. Blunder wasn't going to give a McNaughton opinion, he then couldn't give testimony that would negate the mens rea. As to the mens rea required for gratuitous violence, Mr. Gabrielson has supplied this Court with additional authority. He cited the Wallace case. This Court should be aware that the Wallace case is Wallace 4. The Wallace case has been going on in Arizona for decades. This is the same Wallace case in which the Supreme Court on the same, essentially the same facts, previously upheld the gratuitous violence factor. That's in Wallace 1. It's Wallace 1 that this Court should be looking at in determining if gratuitous violence was established here, not Wallace 4. Mr. Gabrielson doesn't get the benefit of the current law. It was the law at the time in Arizona that applies. And for purposes of determining whether his counsel was ineffective or whether the State court was unreasonable in holding him so? I think what's important is that under Wallace 4 currently, what the Arizona Supreme Court says is there's essentially two prongs. Did the defendant engage in violence more than necessary to kill? And did the defendant continue to inflict violence after the point at which he knew or should have known that he had inflicted the fatal injury? And in Wallace 4, it's that knew or should have known that caused the Arizona Supreme Court to not find the existence of gratuitous violence. That's the mens rea sort of testimony that Golbranson is getting at that his counsel didn't present to the Court. But the standard at the time of his case was whether there was violence done more than necessary to kill. And that goes to the actions. There are cases in Arizona that say that the defendant's mental state in gratuitous violence is demonstrated by his actions. So it's not even clear that some sort of a mental health expert testimony would undo that. In fact, I cited a case in my brief, Jimenez, at which the G1 mitigating factor was found. So there was purely mental health testimony. The defendant was a juvenile, and he had a borderline mentally retarded IQ. And the Court still found that gratuitous violence had been established. But what was the evidence in this case that he did more than necessary to kill? The coroner's report was just the opposite. Yeah. Respectfully, I disagree. What the coroner said was that he couldn't tell which would be the fatal injury, but that a laceration to the liver and the crushing, whether it was a strangulation or by blunt object to the throat, would have caused asphyxiation. I need some water. I'm sorry. And that either of those would have been enough alone to kill her, and that he believed that the injuries had been inflicted before he died. Even under the current standard of gratuitous violence, if he inflicts violence past the point where he knew he should have known the fatal injury was inflicted, not past the point at which she died or until she died or that. I just want to point one more case out to the Court, and then I'll get to the facts that establish gratuitous violence. Wallace 4 cites to Bocharski, State v. Bocharski, as establishing this evolved, clarified standard of gratuitous violence that uses the second prong. Bocharski specifically cites to Gulbranson as being different from Bocharski, in which the Arizona Supreme Court threw out gratuitous violence, and says that Gulbranson is different because in Gulbranson, the defendant used different methods to kill. He didn't use just one method to kill. In Bocharski, it was a, it was knife wounds, 24 knife wounds, I believe, in rapid succession, inflicted in less than a minute. Distinguish that from Gulbranson, at which he uses three or four knives, a pair of scissors, a wooden salad fork. He beats her with his hands and his feet. He pulls out clumps of hair by the roots, which that's not even a potentially fatal injury. He lights her hair on fire. Whether it's stone or head or after he pulls it out, that's not exactly clear. But there's a reasonable inference that he tried to light her on fire. He breaks five ribs in the front, two ribs from the back. He breaks her nose, two black eyes. This was clearly more than was necessary to kill. And in Bocharski, the Supreme Court recognized that because he used different methods to inflict the killing and because he used a variety of weapons, this wasn't just a quick, protracted, losing control. For example, Gulbranson says that she threw the pair of scissors at him, and that's what caused him to attack her. One would think if that was the case, he would have picked up the scissors and he would have stabbed her with the scissors. Not with the scissors, three knives, a salad fork, you know, beating her, kicking her, stomping on her, crushing her throat, and pulling her hair out by the clumps, by the roots. That is very different than what was done in Bocharski. Which raises the question of whether he was insane. Well, and there were three doctors unwilling to opine that he was insane. So I think that pretty much disposes of that. The fact that his two sisters were willing to give lay opinions, that just simply wasn't enough for this jury, nor should it have been. So clearly I think the gratuitous violence aggravator was established here, and whether some sort of mental health evidence beyond what Dr. Blinder gave, and he provided gratuitous violence testimony, would not have been enough to undo it. There was also the helplessness. So those things, two things together. Granted, it's one aggravating factor, but in Arizona, it's not the number of aggravating factors, it's the weight. And in this case, the facts and circumstances of the crime are so brutal and so disturbing that it's understandable that the sentencing judge would have given that single aggravating factor enormous weight. Now, you're saying there's a single aggravating factor. I thought you said there were two. It's a single aggravating factor. It's heinousness and depravity. Well, it's whether the crime was a special. By helplessness. And I thought that was out of the case. It's not. The aggravating factor is F6, and it's whether the crime was especially heinous, cruel, or depraved. The sentencing judge did not find the cruel portion. He found heinous and depravity are actually one prong, even though they're two words, but it's one prong. And for heinousness and depravity under State v. Gretzler, there's several things that you can find to establish that. Gratuitous violence is one. Helplessness is one. Relishing. Mutilation. And there's another one that's escaping me right now. All of those are subsets. They are subsets of heinousness and depravity. And the sentencing judge found relishing, gratuitous violence, and helplessness. The Arizona Supreme Court independently reviewed that very thoroughly. And throughout the relishing, he went to Laughlin and he gambled the money that he had stolen from her. And that, combined with some other testimony, the sentencing judge found demonstrated relishing. The Arizona Supreme Court found in its independent review that that was not enough under Arizona law to establish relishing. But because gratuitous violence and helplessness still existed, that was enough to establish the F-6 aggravating factor. Does the Court have any other questions for me? It appears not. If not, then I would simply ask that this Court affirm the district court's denial of habeas relief. Thank you. All right. Thank you, counsel. Counsel, we'll give you two minutes for rebuttal. In Wallace, and this is important, the Court didn't say we're establishing the Arizona Supreme Court didn't say we're establishing a new rule that tells folks when gratuitousness is established or not. In both Bucharski and in Wallace, the Court said we've been inconsistent in how we've applied the factor. And we just want to be clear now that because heinousness and depravity, heinousness or depravity, goes to the mental state of the defendant, we want it to be absolutely clear that there have to be two findings made. And I didn't say they were just announcing this for the first time in these two cases, and there are some older cases that sort of fish around in this area as well. The Court said you have to prove that the defendant inflicted injuries that were greater than what was needed to kill. But secondly, and critically for Mr. Gilbranson, the Court said the prosecution has to prove beyond a reasonable doubt that the defendant knew or should have known when the fatal injury was inflicted and, therefore, that any additional injuries were gratuitous. That's what the Court said. If the position of the State is that somehow the statutory aggravating factors are on such weak foundation that they sort of slip-slide around and a guy who's tried, you know, or has an appeal decided like Mr. Gilbranson did recently where the Court invalidates gratuitousness where, on par, which is the worst crime? Can you really say that what Mr. Gilbranson did was worse? It was one victim. It was a domestic dispute. Mr. Wallace, on the other hand, was living with a woman who had two teenage children. He killed the woman. He beat her to death. He took a baseball bat. He beat the 16-year-old girl. She wasn't sufficiently dead yet. So he broke the bat in half and jammed the broken bat through her neck. He decided that that wasn't a quick enough solution. He probably went out to the garage and he got a pipe wrench. And when the 12-year-old boy or 13-year-old boy came home, he beat the kid to death in the head with the pipe wrench. Multiple instrumentalities. Three victims. And the Arizona Supreme Court acknowledged, you know, this is really gruesome. A lot of these cases are gruesome. And Bocharski, I think, was even worse. I think 24 stab wounds, which is a lot like Gilbranson. But the Court said it's not enough simply to say that they inflicted all this violence. For that part of the statutory aggravator that says depravity and heinousness go to the mental state of the defendant, there has to be something more than simply he inflicted a lot of injuries. That's not really an aggravator. And I would submit that if the States allowed to sort of say that these statutory aggravators are somehow malleable and they change over time, you know, the U.S. Supreme Court, I think it was in Zant v. Stevens, probably close to 30 years ago now, said these factors have to be fixed. They don't get to change them over time. They have a fixed meaning. And so in Mr. Gilbranson's case, I just simply take offense with the notion that Wallace announced a new rule. It was not a new rule. The Court acknowledged. All right, counsel. We understand your argument. You've exceeded your time. Thank you to both counsel. The case just argued is submitted for decision by the Court. We are in recess until 9.30 a.m. tomorrow morning. Thank you. All rise. This court for the session now stands adjourned. Thank you.
judges: Nelson, Rawlinson, Ikuta